**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE, NORTHERN DIVISION**

| | | |
|---|---|---|
| **TIRE DISCOUNTERS, INC.,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:19-cv-00483** |
| | ) | |
| **PEOPLE'S DEVELOPMENT COMPANY, INC.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF TIRE DISCOUNTERS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Comes the Plaintiff/Counter-Defendant Tire Discounters, Inc. ("Tire Discounters"), and submits this Memorandum of Law in Support of Tire Discounters' Motion for Partial Summary Judgment.

In short, Tire Discounters has moved for summary judgment on the Defendant/Counter-Plaintiff People's Development Company, Inc.'s ("PDC") breach of contract counterclaim [Doc. 24 ("Count Two")] and related affirmative defenses [Doc. 24 ("Affirmative Defenses" 4, 8 & 9)]. PDC's counterclaim and defenses relate to whether Tire Discounters breached Section 3.2 of the parties' commercial build to suit Lease by suggesting that PDC pay for $28,620.50 in anticipated "Site Work" cost overruns. Via its counterclaim PDC seeks to recover monetary damages from Tire Discounters, while via its defenses PDC seeks to bar a recovery by Tire Discounters for PDC's failure to construct the Building and Site Work contemplated in the Lease.

Tire Discounters asserts three threshold grounds on summary judgment, any one of which warrants summary judgment in favor of Tire Discounters. **FOR ONE**, the counterclaim and affirmative defenses are not ripe, and therefore, not justiciable. That is, PDC neither signed a construction contract with its contractor, Richardson Turner Construction ("RTC"), nor performed

the construction required under the Lease so as to incur and trigger any adjustment for the $28,620.50 in anticipated "Site Work" cost overruns under Section 4.3 of the Lease; thereby reducing the counterclaim and defenses to mere hypotheticals for which a recovery or estoppel cannot be had at this time. **TWO**, as a matter of law, Section 3.2 of the Lease does not obligate Tire Discounters to pay for the $28,620.50 in anticipated cost overruns for "Site Work," as it instead only obligates Tire Discounters to pay for actual cost overruns "in the Building." **THREE**, as a matter of law, a mere suggestion by Tire Discounters (specifically, its suggestion on September 10, 2019) for PDC to pay for the $28,620.50 in anticipated Site Work cost overruns does not constitute an anticipatory breach/repudiation of Section 3.2 of the Lease, as it does not rise to the requisite level of "a total and unqualified refusal to perform" the Lease.

Each of these three grounds are discussed in depth in the "Argument" that follows.

## I. Concise Statement of Facts.

Tire Discounters contemporaneously filed its separate statement of material facts in support of its motion for partial summary judgment in accordance with by Rule 56 of the *Federal Rules of Civil Procedure* and Section 6(b)-(c) of the Court's Scheduling Order [Doc. 30], which Tire Discounters incorporates by reference herein.[1]

## II. Standard of Review.

The general standard of review on a motion for summary judgment has recently been summarized as follows:

> Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the burden of showing that there is no genuine dispute of material fact in the case. This may be accomplished by pointing out to the court that the non-moving party lacks evidence to

[1] The citations to the depositions referenced in this brief are included in the exhibits to the Concise Statement of Material Facts.

> support an essential element of its case. "Facts are material if they "'might affect the outcome of the suit under the governing law.'" "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"
>
> In response, the non-moving party must go beyond the pleadings and present significant probative evidence to demonstrate that there is more than "some metaphysical doubt as to the material facts." "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." "When the nonmovant does not effectively address the movant's assertion of a fact, the district court may 'consider the fact undisputed for purposes of the motion.'"
>
> In deciding a motion for summary judgment, the court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Finally, a court considering a motion for summary judgment may not weigh evidence or make credibility determinations.

*See Webb v. Shelby Co.*, 2017 WL 685777, *3 (W.D. Tenn., Jan. 31, 2017) (citations omitted).

## III. Argument.

### A. PDC's COUNTERCLAIM AND AFFIRMATIVE DEFENSES RELATED TO ANTICIPATED COST OVERRUNS ARE NOT RIPE, AND THEREFORE, NOT JUSTICIABLE.

PDC has asserted a counterclaim for breach of contract [*see* Doc. 24 ("Count Two")] and multiple affirmative defenses related to anticipated costs overruns [*see* Doc. 24 ("Affirmative Defenses," 4, 8 & 9)]. This claim, and these defenses, are not ripe, and therefore, not justiciable in this action. For one, the claim and defenses are not fit for judicial decision because they relate to hypothetical and contingent future events that relate to the actual costs of completing construction, which construction has not even commenced. Two, withholding the claims and defenses related to anticipated cost overruns from the Court's consideration at this time, does not impose a meaningful hardship on PDC that was not already contemplated by the parties at the time of contracting and addressed in Section 4.3 of the Lease.

More particularly, courts have long recognized that "'the province of a court is to decide, not advise, and to settle rights, not to give abstract opinions.'" *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 203 (Tenn.2009) (quoting *State v. Wilson*, 70 Tenn. 204, 210 (1879)). Thus, courts decide only "'legal controversies'" [*Id.* (quoting *White v. Kelton*, 144 Tenn. 327, 232 S.W. 668, 670 (1921))], and a legal controversy exists "when the disputed issue is real and existing, and not theoretical or abstract, and when the dispute is between parties with real and adverse interests" [*Id.* (citations omitted)]. To determine whether a particular case involves a legal controversy, courts use justiciability doctrines that "mirror the justiciability doctrines employed by the United States Supreme Court and the federal courts," and these doctrines "include: (1) the prohibition against advisory opinions, (2) standing, (3) ripeness, (4) mootness, (5) the political question doctrine, and (6) exhaustion of administrative remedies." *Id.* (footnotes omitted). The Tennessee Supreme Court has stated that:

> *If the controversy depends upon a future or contingent event, or involves a theoretical or hypothetical state of facts, the controversy is not justiciable.* If the rule were otherwise, the courts might well be projected into the limitless field of advisory opinions.

*See West v. Schofield, 468 S.W.3d 482, 490, citing West v. Schofield*, 460 S.W.3d 113, 130 (Tenn. 2015) (emphasis added) (citations omitted) (quoting *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 193 (Tenn.2000)) (internal quotation marks omitted).

Ripeness is the justiciability doctrine at issue in Tire Discounters' Motion for Summary Judgment. Ripeness requires a court to answer the question of "whether the dispute has matured to the point that it warrants a judicial decision." *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 848 (Tenn. 2010). "[R]ipeness is peculiarly a question of timing." *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). "[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from

entangling themselves in abstract disagreements . . . ." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). "The central concern of the ripeness doctrine is whether the case involves uncertain or contingent future events that may or may not occur as anticipated or, indeed, may not occur at all." *B & B Enters.*, 318 S.W.3d at 848 (citing *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 479– 80, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)).

In determining whether a particular case is ripe, courts typically engage in a two-part analysis, evaluating "[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507; *see also B & B Enters.,* 318 S.W.3d at 848; *Warshak v. United States,* 532 F.3d 521, 525 (6th Cir. 2008) (en banc) (describing the two-part inquiry as: "(1) [I]s the claim fit for judicial decision in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? [A]nd, (2) what is the hardship to the parties of withholding court consideration?" (citations and internal quotation marks omitted)).

**1.** ***Fitness for Judicial Decision.***

The first ripeness prong — fitness for judicial decision — requires the court to consider whether PDC's claim and defenses related to anticipated cost overruns are based on an existing legal controversy or on hypothetical and contingent future events that may never occur. *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (stating that "[a] claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, *or indeed may not occur at all*.'" (emphasis added) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985))).

Here, *prior to* construction of the project contemplated in the Lease, PDC presented Tire Discounters with *anticipated* cost overruns for the Building and Site Work should PDC enter into a contract with RTC to perform the construction of the project. PDC, though, never actually entered into that contract with RTC, never authorized RTC to perform the construction, and did not wait until the completion of the construction to seek an adjustment of any *actual* cost overruns as required by Section 3.2 and Section 4.3 of the Lease.

With regard to that latter trigger, Section 3.2 provides that any cost overruns for which Tire Discounters is responsible shall by payable by Tire Discounters "pursuant to the same calculation used for Change Orders in Section 4.3." Section 4.3 provides, in pertinent part:

> Upon completion of the construction of the Building, Lessor shall prepare a summary setting forth the net adjustment in the cost of the Building caused by Change Orders. Lessor's costs shall be based upon the actual cost incurred in designing and performing the Change Order work, including, without limitation, design and engineering, insurance, supervision, and other soft costs relating to or incurred during construction, as well as the cost of labor, materials, equipment and other costs of the work that would be included in a "cost-plus" calculation under the AIA forms of construction contract. The annual Rent set forth in Section 3.1 shall be increased by a factor of 6.85% of the Change Order amount calculated pursuant to this paragraph.

*See* Doc. 1-1 (Section 4.3) (underline emphasis added); *see also* Doc. 24 (¶ 8).

So, under Sections 3.2 and 4.3 of the Lease PDC's claim and defenses related to anticipated cost overruns do not become ripe, and therefore justiciable, until after PDC has constructed the project contemplated by the Lease and upon completion of the construction adjusted the annual Rent upward by a factor of 6.85% of the cost overrun amount (assuming that an actual cost overrun does occur from the construction), with Tire Discounters refusing at that time to pay that adjusted Rent amount. None of that happened, as it is undisputed that PDC never even signed a contract with RTC to perform the construction. Thus, PDC's claim and defenses related to anticipated cost overruns fail the first ripeness prong — fitness for judicial decision — as they are not based on an

existing legal controversy, but instead on hypothetical and contingent future events that have never occurred.

### <u>2.</u> ***<u>Hardship to the Parties of Withholding Court Decision.</u>***

The second ripeness prong requires consideration of whether withholding adjudication of PDC's claim and defenses related to anticipated cost overruns at this time will impose any meaningful hardship on the parties. "The prototypical case of hardship comes from the claimant who faces a choice between immediately complying with a burdensome law or 'risk[ing] serious criminal and civil penalties.'" *Warshak*, 532 F.3d at 526 (quoting *Abbott Labs.*, 387 U.S. at 153, 87 S.Ct. 1507). This prototypical hardship is not present in this litigation.

Instead, in the case at bar, there will be an opportunity to address actual cost overruns (if any) after completion of the construction, and should a disagreement ensue at that future date, then PDC would have the opportunity at that time to pursue any legal remedies arising from any Rent adjustments that it believed were necessitated by any actual cost overruns. In fact, Section 4.3 of the Lease expressly contemplates that the time at which PDC and Tire Discounters will adjust for cost overruns is "[u]pon completion of the construction of the Buidling" [*see* Doc. 1-1 (Section 4.3)], NOT before the construction even begins. And this is entirely logical, for the actual cost overruns warranting any upward adjustment to the Rent cannot be known until the construction has been completed, as various change orders during the process of construction may reduce or increase the actual costs incurred. Thus, PDC's claim and defenses related to anticipated cost overruns also fail the second ripeness prong — hardship to the parties — as there is no meaningful hardship to be imposed on PDC concerning the timing and method for cost overrun adjustments that was not already contemplated by the parties at the time of contracting and addressed in Section 4.3 of the Lease.

## B. AS A MATTER OF LAW, THE LEASE DOES NOT OBLIGATE TIRE DISCOUNTERS TO PAY FOR THE $28,620.50 IN ANTICIPATED COST OVERRUNS FOR SITE WORK THAT UNDERLIE PDC's COUNTERCLAIM AND AFFIRMATIVE DEFENSES.

[*If the Court finds that PDC's counterclaim and affirmative defenses related to cost overruns is not ripe [see Argument "A" above], then the Court need not consider this additional ground for summary judgment.*]

Assuming *arguendo* that PDC's counterclaim and affirmative defenses are somehow ripe and therefore justiciable in this action, a second threshold legal issue concerning contract interpretation still remains, specifically -- *Whether the Lease obligates Tire Discounters to be responsible for the anticipated cost overruns about which PDC complains*? The short answer is that the Lease unambiguously allocates responsibility to Tire Discounters for cost overruns "in the Building," while allocating responsibility to PDC for cost overruns of any other variety; and since the cost overruns about which PDC complains related to "Site Work," they are necessarily of the variety for which PDC is responsible.

One of the essential elements of a breach of contract claim under Tennessee law is the existence of an enforceable contract. *See Waste Services of Decatur, LLC v. Decatur County*, 367 F. Supp. 3d 792, 809 (W.D. Tenn., 2019) (citations omitted). Although it is undisputed that the Lease is an enforceable contract between PDC and Tire Discounters [*see* Doc. 1-1; *see also* Doc. 24 (¶ 8], a threshold issue arising from that Lease is whether it obligates Tire Discounters (versus PDC) to pay for cost overruns related to Site Work.

Germane to this threshold issue is Section 3.2 of the Lease, which provides in pertinent part:

> Should the actual construction cost exceed the Estimated Cost, and such additional costs are the result of differences <u>in the Building</u> as shown in the Final Plans (as hereinafter defined) as compared to the Outline Specifications (as hereinafter defined), Lessee shall be responsible for the difference between such actual cost and the Estimated Cost payable by Lessee to Lessor pursuant to the same calculation used for Change Orders in Section 4.3 .

> . . Should the actual construction costs be greater than Estimated Cost for any reason other than that specified in the foregoing two sentences, Lessor shall be solely responsible for the difference . . .

*See* Doc. 1-1 (§ 3.2); *see also* Doc. 24 (¶ 8) (underline emphasis added).[2]

In construing the terms of this Section 3.2, the Court is to ascertain the intent of the parties based on the ordinary and natural meaning of the words used in the instrument. *Perkins v. Metro. Gov't of Nashville*, 380 S.W.3d 73, 85 (Tenn. 2012); *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). A court must consider the entire contract in construing any or all of its parts. *Cocke Cnty. Bd. Of Highway Cm'rs. v. Newport Util. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985). This means that "a contract must be viewed from beginning to end, and all its terms must pass in review, for one clause may modify, limit, or illuminate another." *Id.* The construction of a contract presents a question of law. *Toomey v. Atyoe*, 95 Tenn. 373, 32 S.W. 254, 256 (1895); *Manley v. Plasti-Line, Inc.*, 808 F.2d 468, 471 (6th Cir. 1987); *see also* 10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2730.1 (3d. ed. 2009) ("The legal effect or construction of a contract is a question of law that properly may be determined on a summary-judgment motion when the parties' intentions are not in issue.").

"A court's initial task in construing a contract is to determine whether the language of the contract is ambiguous." *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). "If the contract language is unambiguous, then the parties' intent is determined from the four corners of the contract." *Ray Bell Const. Co., Inc. v. State, Tenn. Dept. of Transp.*, 356 S.W.3d 384, 387 (Tenn. 2011) (citing *Whitehaven Cmty. Baptist Church v.*

[2] The omitted sentence is not pertinent as it relates to cost overruns from Change Orders made during construction, and since construction was never commenced, there are no such Change Orders to consider, thereby rendering the sentence not applicable for purposes of the claims and defenses pending in this action. *See* Cappiello Depo (pp. 76-77, ll. 14-18).

*Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)). Terms are not ambiguous merely because the parties disagree as to the interpretation of a given clause. *Cookeville Gynecology & Obstetrics, P.C., v. Se. Data Sys., Inc.*, 884 S.W.2d 458, 462 (Tenn. Ct. App., 1994).[3]

Here, it is undisputed that the terms of the Lease are unambiguous. For instance, PDC has affirmatively represented to the Court since the outset of this action that the Lease "speaks for itself and is the best evidence of its terms and conditions." *See* Doc. 24 (¶ 8). Accordingly, the Court is to determine the intent of PDC and Tire Discounters concerning their respective responsibilities for cost overruns from the four corners of the contract.

Within those four corners is Exhibit B to the Lease, which is the construction cost estimate to which Section 3.2 references. That estimate plainly segregates the construction costs into "Building" and "Site Work." This is significant because under Section 3.2, the type of construction cost overruns for which Tire Discounters would be responsible are those that are "in the Building." Any cost overruns that are not "in the Building" are the responsibility of PDC, specifically:

> Should the actual construction costs be greater than Estimated Cost for any reason other than that specified in the foregoing two sentences, Lessor [PDC] shall be solely responsible for the difference . . .

*See* Doc. 1-1 (§ 3.2); *see also* Doc. 24 (¶ 8).

So what type are the cost overruns about which PDC complains? To answer that question, PDC defers to its expert, John R. Anderson, P.E., who relied upon the anticipated actual costs prepared by RTC. *See, e.g.*, Cappiello Depo (pp. 66-71, ll. 24-1); Anderson Depo (Exh. 33, ¶¶ 19-21). Just like Exhibit B to the Lease, Mr. Anderson's opinions as to the differences between the estimated costs in Exhibit B and RTC's anticipated actual costs are segregated into two separate

---

[3] All of these authorities are compiled and cited with approval in *Waste Services of Decatur, LLC, v. Decatur County,* 367 F. Supp.3d 792, 803 (W.D. Tenn., 2019).

types – "Building" costs and "Site Work" costs. *Compare* Document 1-1 (Exh. B) with Anderson Depo (Exh. 33, ¶¶ 19-21). Specifically, Mr. Anderson testified that "the total amount of construction hard cost for the "Building" is $1,257,994.00, which is $57,994.00 more than cost provided for in the Lease Estimated Cost." *See* Anderson Depo (Exh. 33, ¶ 20). Mr. Anderson, though, admitted that this $57,994.00 difference in cost overruns related to the "Building" was zeroed-out by the September 10, 2019 suggestion that Tire Discounters submitted to PDC. *See* Anderson Depo. (pp. 107-108, ll. 13-18). As such, the only anticipated cost overruns that would have remained were those related to the "Site Work," about which Mr. Anderson testified that "the total amount of construction hard cost for the "Site Work" is $377,319.00, which is $116,319.00 more than cost provided for in the Lease Estimated Cost." *See* Anderson Depo (Exh. 33, ¶ 21). Mr. Anderson, though, admitted that this $116,319.00 difference in cost overruns related to the "Site Work" was reduced to $28,620.50 by the September 10, 2019 suggestion that Tire Discounters submitted to PDC. *See* Anderson Depo (pp. 109-111, ll. 16-3).

Hence, from PDC's own evidence, the threshold issue is whittled down to a determination of whether the $28,620.50 in RTC's anticipated cost overruns for "Site Work" are the "in the Building" costs for which Tire Discounters has responsibility under Section 3.2 of the Lease. Since those costs are "Site Work," not "in the Building," costs, the answer is clearly "NO."

PDC, though, having recently discovered from its own expert that there were not in fact any anticipated cost overruns related to the "Building" that Tire Discounters did not propose to pay, pivots to assert that "in the Building" in Section 3.2 is meant to cover cost overruns not only "in the Building" but also outside the Building (i.e., "Site Work"), even though such costs are necessarily not "in the Building."

PDC supports its interpretation with the definition of "Building" in Section 4.1 of the Lease, which provides:

> "Building" shall mean the approximately 8,250 square foot Tire Discounters retail and service facility together with the parking areas, drives, utility facilities and related improvements to be constructed substantially in accordance with the preliminary plans and specifications described in Exhibit C attached to this Lease (the "Outline Specifications") and substantially in accordance with the final drawings, plans and specifications to be developed from the Outline Specifications pursuant to the provisions of Section 4.2 below (the "Final Plans").

*See* Doc. 1-1 (4.1(ii)); *see also* Doc. 24 (¶ 8). PDC contends that the phrase "the parking areas, drives, utility facilities and related improvements to be constructed" includes Site Work. Rules of contract construction, though, require that this definition be read in conjunction with the other terms of the contract so as to give meaning to each – which would include reading it in conjunction with Section 3.2 and Exhibit B. Here, Exhibit B, which specifically relates to costs, distinguishes between "Building" costs and "Site Work" costs, with the specific term "Site Work" appearing nowhere in the definition for "Building" in Section 4.1. Regardless, the term "Building" in Section 3.2 is used in the preposition phrase of "in the Building." The "in" qualifier limits the term "Building" in the context of responsibility for cost overruns in Section 3.2 to those that are in the Building as opposed to any cost overruns outside the Building, with Site Work costs indisputably being the outside the Building costs per the cost segregation in Exhibit B of the Lease.

Thus, the Lease is unambiguous that Tire Discounters is responsible for cost overruns in the Building, whereas PDC is responsible for cost overruns in the Site Work. And since the cost overruns about which PDC complains are of the "Site Work" variety, as a matter of law, PDC cannot maintain a breach of contract counterclaim or affirmative defenses arising from Tire Discounters purported refusal to be responsible for those costs.

## C. AS A MATTER OF LAW, TIRE DISCOUNTERS' SUGGESTION FOR PDC TO PAY FOR THE $28,620.50 IN SITE WORK COST OVERRUNS DOES NOT CONSTITUTE AN ANTICIPATORY BREACH/REPUDIATION OF THE LEASE.

[*If the Court finds that PDC's counterclaim and affirmative defenses related to cost overruns is not ripe [see Argument "A" above] or that the Lease does not obligate Tire Discounters to be responsible for "Site Work" cost overruns [see Argument "B" above], then the Court need not consider this additional ground for summary judgment.*]

Assuming *arguendo* that Tire Discounters is obligated under Section 3.2 of the Lease to pay for anticipated cost overruns related to Site Work, a third threshold issue still remains: *Whether a suggestion by Tire Discounters prior to commencement of construction for PDC to pay for the $28,620.50 in Site Work cost overruns rises to the level of an anticipatory breach/repudiation of the Lease*? The short answer is that reasonable minds cannot differ that Tire Discounters' September 10, 2019 suggestion upon which PDC relies does not rise to the requisite level of a "total and unqualified refusal to perform" the Lease by Tire Discounters. Instead, the suggestion was merely in furtherance of a negotiation to try to find a solution to PDC's premature and abstract issue related to future cost overruns anticipated by RTC for the construction project.

Another of the essential elements of a breach of contract claim under Tennessee law is nonperformance amounting to a breach of the contract. *See Waste Services of Decatur, LLC v. Decatur County*, 367 F. Supp. 3d 792, 809 (W.D. Tenn., 2019) (citations omitted). PDC asserts that the purported breach of Section 3.2 of the Lease by Tire Discounters is anticipatory in nature. Anticipatory breach/repudiation is a question of law when reasonable minds could reach only one conclusion. *See* 4C Anderson U.C.C. 2A-402:47 *Questions of law or fact* (3rd ed.).

Anticipatory repudiation is defined as "[a] contracting party's words or actions that indicate an intention not to perform the contract *in the future*." *See Waste Services of Decatur v. Decatur County*, 367 F.Supp.3d 792, 812 (W.D. Tenn. 2019) *citing* Black's Law Dictionary (10th ed. 2014) (emphasis added). Tennessee refers to this as the doctrine of anticipatory repudiation meaning a

repudiation, which "occurs before the time that a contract requires a party to perform." *UT Med. Grp., Inc. v. Vogt*, 235 S.W.3d 110, 120 (Tenn. 2007). "In order to serve as an anticipatory breach of contract or repudiation, the words and conduct of the contracting party must amount to <u>a total and unqualified refusal to perform</u> the contract." *Wright v. Wright*, 832 S.W.2d 542, 545 (Tenn. Ct. App. 1991) (citing *Ky. Home Mut. Life Ins. Co. v. Rogers*, 196 Tenn. 641, 270 S.W.2d 188 (1954); *Brady v. Oliver*, 125 Tenn. 595, 147 S.W. 1135 (1911)) (underline emphasis added).

The Sixth Circuit, in interpreting Tennessee law regarding anticipatory repudiation, has found informative Article II of the Uniform Commercial Code ("UCC"), which has been adopted in Tennessee, noting that "[w]hile the UCC Article II applies to goods . . . it may be applied by analogy" to other types of contracts. *See UMIC Gov't Sec., Inc. v. Pioneer Mortg. Co.*, 707 F.2d 251, 253 (6th Cir. 1983). The Comments to UCC Article II, at *Tenn. Code Ann.* § 47-2-610, provide that "anticipatory repudiation centers upon an *overt* communication of intention or an action which . . . demonstrates *a clear determination* not to continue with performance." *Tenn. Code Ann.* § 47-2-610, Uniform Commercial Code Comment 1 (quoted in *UMIC Gov't Sec., Inc. v. Pioneer Mortg. Co.*, 707 F.2d 251, 253 (6th Cir. 1983)) (emphasis added).

Here, on September 10, 2019, Tire Discounters merely *suggested* as follows: "I [Tire Discounters] split the difference 50/50 and added an additional $28,620.50 back into the budget . . . Please give me a call to discuss as soon as you've had a chance to review." *See* Zola Depo. (Exh. 18). Later that same day, Tire Discounters further explained its suggestion as follows:

> After the value engineering deducts and the addition of the $57,994.00 back into the budget, the Total Construction Cost overage was $57,241.00. <u>I'm suggesting</u> that we split this $57,241.00 overage 50/50. We would end up absorbing $28,620.50 (see cell B10 in the spreadsheet) and you would be absorbing $28,620.50 as well (see cell E25 in the spreadsheet). This is more than fair.

> My rationale for what I'm suggesting is pretty simple. I'm agreeing to open the lease budget back up and increase the monthly rent that we would be paying you when we have no obligation to do so.
>
> Happy to discuss further if you'd like to do so.

*See* Doc. 19-1 (underline emphasis added). PDC's response later that evening is telling, which in pertinent part provided:

> Yes, let's have a discussion.

*See* Zola Depo (Exh. 19). Nevertheless, for purposes of this litigation, PDC disingenuously contorts the September 10, 2019 suggestion into a purported notice to "PDC that Plaintiff would not be responsible for certain additional costs to construct the Building despite its obligation to do so under Section 3.2 of the Lease." *See* Doc. 24 ("Affirmative Defenses, ¶ 8). Needless to say, prior to the September 10, 2019 suggestion, Tire Discounters had already signed the Lease, and was therefore already obligated to pay whatever the Lease lawfully requires it to pay. *See* Doc. 1-1. So, reasonable minds cannot differ that Tire Discounters' subsequent act of suggesting a solution to a hypothetical presented by PDC – i.e., that PDC pay for the $28,620.50 in anticipated Site Work cost overruns – does not rise to the level of a "total and unqualified refusal to perform" Section 3.2 of the Lease by Tire Discounters (i.e., to pay the Rent required under the Lease after any Section 3.2 cost overrun adjustments are made "upon completion of the construction" under Section 4.3 of the Lease). Tire Discounters' act only suggested a course of action or a negotiation to a premature and abstract discussion related to the anticipated actual costs for the construction, which course PDC agreed to discuss further.

As held by the Tennessee Supreme Court, "[a]n indication that more negotiations are sought is not a total and unqualified refusal to perform" for purposes of anticipatory repudiation. *UT Med. Grp., Inc. v. Vogt*, 235 S.W.3d 110, 120 (Tenn. 2007) (citing *Palmiero v.*

*Spada Distr. Co.*, 217 F.2d 561, 565 (9th Cir.1954) (holding that "an anticipatory breach of contract is not established by a negative attitude or one which indicates that more negotiations are sought")); *see also Law v. Bioheart, Inc.*, No. 2:07-CV-2177, 2009 WL 693149, at *16 (W.D. Tenn. Mar. 13, 2009), *order clarified*, No. 2:07-CV-2177, 2009 WL 10700614 (W.D. Tenn. Oct. 15, 2009) ("There was no evidence that Bioheart has expressed, said, or done anything to totally and unqualifiedly repudiate an obligation to pay royalties should they become due.").

The Comments to Tennessee's Uniform Commercial Code even plainly state that "a demand by one or both parties for more than the contract calls for in the way of counter-performance is not in itself a repudiation nor does it invalidate a plain expression of desire for future performance." *Tenn. Code Ann.* § 47-2-610, Uniform Commercial Code Comment 2. Rather, to constitute anticipatory repudiation, "a fair reading [must] amount[] to a statement of intention not to perform except on conditions which go beyond the contract . . . ." *Id.*

Tire Discounters' statement in the September 10 emails were simply a suggested course of action, a proposal, or a negotiation. At best for PDC, they were merely "a demand . . . for more than the contract calls for . . .,"; but absent therefrom was any statement by Tire Discounters that it was not going to perform the Lease unless PDC paid for cost overruns in amounts that exceeded PDC's responsibilities under Section 3.2 of the Lease. Thus, as a matter of law, Tire Discounters' suggestion for PDC to pay for the $28,620.50 in Site Work cost overruns does not constitute an anticipatory breach/repudiation of the Lease.

**IV. Conclusion.**

WHEREFORE, for the foregoing reasons and other good cause, Tire Discounters requests that its Motion for Partial Summary Judgment as to PDC's breach of contract counterclaim [Doc.

24 ("Count Two")] and related affirmative defenses [Doc. 24 (Affirmative Defendants, ¶¶ 4, 8 & 9)] be granted.

DATED this 22nd day of March 2021.

Respectfully submitted,

**TIRE DISCOUNTERS, INC.**

s/ Gary L. Edwards
Gary L. Edwards, Esq.
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
100 Med Tech Parkway, Suite 200
P.O. Box 3038
Johnson City, TN 37602
TN Bar No. 20058; VA Bar No. 44848;
NC Bar No. 27553
(423) 975-7634; Fax: (423) 979-7634
gedwards@bakerdonelson.com
and
Jacob S. Gibson, Esq.
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
265 Brookview Centre Way, Suite 600
Knoxville, TN 37919
TN Bar No. 035145
(865) 549-7000
jgibson@bakerdonelson.com

*Counsel for Plaintiff/Counter-Defendant Tire Discounters, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

s/ Gary L. Edwards
Gary L. Edwards, Esq.