UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| TIRE DISCOUNTERS, INC., | ) | |
|---|---|---|
| Plaintiff, | ) | 3:19-CV-00483-DCLC |
| vs. | ) | |
| PEOPLE'S DEVELOPMENT COMPANY, INC., | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the parties' cross motions for summary judgment. Plaintiff Tire Discounters ("Tire Discounters") filed the initial complaint [Doc. 1] and Defendant People's Development Company ("PDC") filed an answer and countercomplaint [Doc. 7] which it later amended [Doc. 24]. Tire Discounters filed a Motion for Partial Summary Judgment [Docs. 31, 32] to which PDC responded in opposition [Doc. 39] and Tire Discounters replied [Doc. 45]. PDC also filed a Motion for Partial Summary Judgment [Docs. 36, 37] to which Tire Discounters responded in opposition [Doc. 44]. Both motions are ripe for resolution.

1. **FACTUAL AND PROCEDURAL BACKGROUND**

Tire Discounters and PDC (collectively "the Parties") entered into a lease agreement on December 14, 2018 (the "Lease") in which Tire Discounters planned to open and operate a retail and service facility on PDC's land [Doc. 1, ¶ 9; Doc. 1-1, pg. 1]. Under the Lease, PDC was to build a commercial building on its real property for Tire Discounters to occupy and Tire Discounters was to pay rent to PDC for its use [Doc. 40, ¶ 1]. The parties agree that the Lease is valid, and that it "speaks for itself and is the best evidence of its terms and conditions." [Doc. 40, ¶ 2].

When they executed the Lease, the parties agreed upon a budget for estimated costs of construction, which they attached to the Lease [Doc. 40, ¶ 3; Doc. 1-1, pg. 21].[1] They also included provisions for what should happen if the actual construction costs exceeded their estimated budget. Section 3.2 of the Lease describes the parties' respective responsibilities for cost overruns [Doc. 1-1, pg. 2-3; Doc. 40, ¶ 4] and Section 4.3 provides a process for preparation, modification, and revision of the proposed construction plans before and during construction. Section 4.3 also outlines a process for calculating increases in rent owed to PDC should Tire Discounters be responsible for any cost overruns [Doc. 40, ¶ 5; Doc. 1-1, pg. 4, paragraph 2].

The process by which Tire Discounters would prepare the Final Plans for construction and PDC would review and approve those plans reads as follows:

> By not later than 60 days after the date of this Lease, [Tire Discounters] shall cause its architect and civil engineer to prepare the proposed Final Plans based on the Outline Specifications.[2] [Tire Discounters] shall deliver to [PDC] a copy of those plans. If [PDC] objects to the proposed Final Plans . . . it shall notify [Tire Discounters] within 15 days of [PDC's] receipt of the proposed Final Plans, but if no notice is given the proposed Final Plans shall be deemed approved.

Doc. 1-1, pgs. 3-4, Section 4.3]. The parties do not dispute that on February 22, 2019, Tire Discounters delivered to PDC a copy of the Final Plans for the construction project, and PDC did

---

[1] The estimated budget attached to the Lease separates Construction Hard Cost (which has separate figures for "Building" and "Site Work") and Construction Soft Cost (which includes contractor profit). The total estimated cost for "Building" is $1,200,000.00 and the total estimated cost for "Site Work" is $207,000.00. These construction hard costs "reflect[] building material and labor costs only." [Doc. 1-1, pg. 21].

[2] The "Outline Specifications" are initial architectural plans that were "sent to [PDC] via Dropbox Link on November 16th, 2018" and incorporated into the Lease by reference [Doc. 1-1, pg. 22]. These specifications are not included in the record. The "Final Plans" (triggering the beginning of construction) were to be "substantially similar" to the Outline Specifications pursuant to Exhibit C attached to the Lease [*Id.*] The Lease contemplated that changes would be made to the Final Plans after they were approved through "Change Orders": "During construction, [Tire Discounters] shall have the right to request changes in the Final Plans by submitting to PDC a request for a Change Order." [Doc. 1-1, pg. 4].

not object to the final plans within 15 days of that date [Doc. 1, ¶¶ 15, 16; Doc. 24, ¶¶ 12, 13].[3] On or about February 23, 2019, a retaining wall located near PDC's property collapsed due to "record flooding in Knox County." [Doc. 24, pg. 6, ¶ 1]. PDC claims that "the retaining wall collapse caused a delay in excess of five (5) months" as PDC worked with officials and Tire Discounters to "develop an approved plan to reengineer the wall." [Doc. 24, pg. 6, ¶ 1].

On March 28, 2019,[4] third party general contractor Richardson Turner Construction ("RTC") provided PDC a proposal for the construction project wherein RTC would construct the project in exchange for PDC paying for the actual costs of construction [Doc. 40, ¶ 7]. RTC's proposal was based on the Final Plans[5] and reflected actual costs higher than the estimated construction cost budgeted in the Lease [Doc. 40, ¶¶ 11-14]. The "total amount of construction hard cost for the 'Building' [was] $57,994.00 more than the cost provided for in the Lease Estimated Cost" [Doc. 40, ¶ 12] and the "total amount of construction hard cost for the 'Site Work' [was] $116,319.00 more than the cost provided for in the Lease Estimated Cost." [Doc. 40, ¶ 14].[6] PDC never signed the RTC contract [Doc. 40, ¶ 8].

---

[3] Tire Discounters claims this means the Final Plans were "deemed approved" [on] March 9, 2019," [Doc. 1, ¶ 16] and that after that date the "only condition delaying commencement of construction by [PDC] [was] the receipt of all permitting for construction on the building." [Doc. 24, ¶ 13, 18]. PDC offers no evidence to contradict this, but "denies an inference that its failure to object [within 15 days of receipt of the Final Plans] resulted in any alleged breach of the Lease . . . ." [Doc. 24, ¶ 16].

[4] [*See* Doc. 33-1, pg. 11].

[5] Article 1 of RTC's proposal states that it was prepared based on the building and site plans provided by Tire Discounters dated February 22, 2019 [Doc. 33-1, pg. 12].

[6] After Tire Discounters filed this lawsuit, PDC hired an expert, John R. Anderson, P.E., to opine regarding the difference between the estimated construction costs and the actual costs projected by RTC [Doc. 40, ¶¶ 10, 11]. The parties do not dispute the overage amounts reported by PDC's expert [Doc. 40, ¶¶ 12, 14].

3

In August and September 2019, the parties attempted to close the gap between the estimated construction cost and RTC's bid [Doc. 33-4, pgs. 7-17]. RTC provided them with a list of "VE[7] cost ideas" intended to save money on certain materials and labor to reduce construction costs of the project [Doc. 33-4, pg. 17]. Tire Discounters' representative Jorin Zola ("Zola") wrote to PDC representative Tony Cappiello ("Cappiello") that he had reviewed the VE cost savings and Tire Discounters was "good to proceed with the following VE suggestions." [Doc. 33-4, pg. 16 (Email dated September 9, 2019 at 4:35 PM)]. Cappiello wrote back to Zola regarding these "VE" cost saving ideas:

> While this offers some modest savings, I believe the budget still significantly exceeds what we originally negotiated or anticipated. With that in mind, I hope we can reasonably 'close the gap' as you indicated. I look forward to resolving this matter and hopefully be able to move forward with this project soon.

[Doc. 33-4, pg. 16 (Email dated September 9, 2019 at 11:12 PM)]. The next day Zola sent Cappiello a spreadsheet incorporating some of the projected "VE" cost savings [Doc. 33-4, pgs. 10-13; 15-16 (Email dated September 10, 2019 at 12:12 PM)]. In the email, Zola explained that after the "VE deducts" and adding the Building overage amount of $57,994.00 "back to the budget" there would remain a cost overrun of $57,241.00 [Doc. 33-4, pg. 15]. The parties do not dispute that the "$57,994.00 in cost overruns related to the Building was zeroed out via [this] suggestion made by Tire Discounters on September 10, 2019." [Doc. 40, ¶ 13; Doc. 33-4, pg. 15].[8] Zola further proposed that Tire Discounters and PDC "split this difference" of the remaining overage amount "50/50." [Doc. 33-4, pg. 15].

In response to Zola's email, Cappiello replied:

---

[7] "VE" refers to "value engineering." [See Doc. 33-4, pg. 15 (email dated Tuesday, September 10, 2019 at 3:45 PM)].

[8] After the lawsuit was filed, PDC's expert John R. Anderson testified that the $57,944.00 in cost overruns related to the Building was "zeroed out" via Zola's email [Doc. 40, ¶ 13] and PDC "defers to its expert" concerning the cost overruns [Doc. 40, ¶ 10].

4

> What is your rationale for 'splitting the difference 50/50'? I am absorbing all of this additional cost, correct? Maybe I did not understand your explanation. Please elaborate.

Doc. 33-4, pg. 15 (Email dated September 10, 2019 at 3:45 PM)]. Zola responded:

> After the value engineering deducts and the addition of the $57,994.00 back into the budget, the Total Construction Cost overage was $57,241.00. I'm suggesting that we split this $57,241.00 overage 50/50. We would end up absorbing $28,620.50 . . . and you would be absorbing $28,620.50 as well[.] This is more than fair. My rationale for what I'm suggesting is pretty simple. I'm agreeing to open the lease budget back up and increase the monthly rent that we would be paying you when we have no obligation to do so. Happy to discuss further if you'd like to do so.

[Doc. 40, ¶ 17; Doc. 33-4, pg. 15 (Email dated September 10, 2019 at 5:44 PM)]. Later that evening, Cappiello replied that he wanted to discuss Zola's suggestion concerning the anticipated cost overruns [Doc. 40, ¶ 18]. On September 11, 2019, Zola responded that he "would be happy" to discuss the overrun analysis, and two days later Zola wrote to Cappiello again: "Following up with you on this. Please let me know when you're available to discuss." [Doc. 33-4, pg. 14 (Emails dated September 11, 2019 at 4:01 PM and September 13, 2019 at 11:32 AM)]. Cappiello did not respond to either of these emails, and discussions between the parties ceased [*See* Doc. 43-2, pgs. 9-10, 208:13-209:13].

Two months later, Tire Discounters filed this lawsuit claiming that PDC was "actively delaying construction" on the project [Doc. 1, ¶ 20], was "avoiding contact with Tire Discounters," [Doc. 1, ¶ 23] and was refusing to complete the permitting paperwork necessary to begin construction [Doc. 1, ¶ 21]. Tire Discounters seeks declaratory judgment, specific performance, breach of contract, and breach of the implied duty of good faith and fair dealing [Doc. 1]. PDC filed an answer raising various affirmative defenses and a counter-complaint seeking declaratory judgment[9] and breach of contract against Tire Discounters [Doc. 24]. Tire Discounters filed a

---

[9]   PDC seeks declaratory judgment on two issues: First, that it was not required to begin construction according to the terms of the lease because a retaining wall collapsed near the property

motion for partial summary judgment as to PDC's breach of contract claim and "related affirmative defenses [4, 8, and 9]." [Doc. 31, pg. 1]. PDC also filed for partial summary judgment, asking the Court to dismiss Counts II and IV of Tire Discounters' complaint: specific performance and breach of the implied covenant of good faith and fair dealing [Docs. 36, 37].

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record

---

subject to the Lease, causing a "delay in excess of five (5) months" the type of which was contemplated in Section 4.4 of the Lease: "If [PDC] is delayed at any time in construction of the Building by . . . adverse weather conditions . . . unavoidable casualties . . . or any other causes beyond [PDC's] control, the time for the completion of the Building shall be extended for the period of delay." [Doc. 24, pg. 9, ¶¶ 3-5]; and Second, that Tire Discounters had requested changes made to the Building that would require approval and the "issuance of a surety bond," both of which caused delay, and that continued disagreement between the parties on construction costs meant PDC was not "required to commence construction of the Building by July 14, 2019." [Doc. 24, ¶¶ 8-22]. Tire Discounters does not seek dismissal of PDC's request for declaratory judgment.

6

demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy*, *Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

**III.   ANALYSIS**

**A.   Tire Discounters' Motion for Partial Summary Judgment [Doc. 31]**

Count II of PDC's counter-complaint alleges Tire Discounters breached the Lease "by refusing to be responsible for the increased costs that result from differences between the Building shown on the Final Plans as compared to the Outline Specifications." [Doc. 24, ¶ 26]. Tire Discounters moves to dismiss this claim, asserting three "threshold" grounds for summary judgment: (1) that the counterclaim is not justiciable because it is not ripe; (2) that Tire Discounters is not obligated to pay for anticipated cost overruns for "Site Work" by the terms of the lease; and (3) that Tire Discounters' "mere suggestion" that PDC pay for anticipated "Site Work" overruns was not an anticipatory repudiation of the Lease because it did not "rise to the requisite level of 'a total and unqualified refusal to perform.'" [Doc. 32, pgs. 1-2]. Tire Discounters asserts that any one of these is a basis for granting their motion for summary judgment.

Tire Discounters first argues the PDC's claim for breach of contract is not "ripe," because it is impossible for Tire Discounters to know, let alone be responsible for, the "actual costs" of the construction project "when construction has not even commenced." [Doc. 32, pg. 3]. Tire

7

Discounters contends PDC's claim for breach of contract should be dismissed as not yet "fit for judicial decision" because it relates only to "hypothetical and contingent future events." [Doc. 32, pg. 3].

"To determine whether a particular case involves a legal controversy, Tennessee courts use justiciability doctrines that mirror the justiciability doctrines employed by the United States Supreme Court and the federal courts." *West v. Schofield,* 468 S.W.3d 482, 490 (Tenn. 2015) (internal quotation marks and citations omitted). One of these, the "ripeness doctrine," ensures "that the harm asserted by a party has matured sufficiently to warrant judicial intervention." *Warth v. Seldin*, 422 U.S. 490, 499, n. 10 (1975). "The central concern of the ripeness doctrine is whether the case involves uncertain or contingent future events that may or may not occur as anticipated or, indeed, may not occur at all." *B & B Enterprises of Wilson Cty., LLC v. City of Lebanon*, 318 S.W.3d 839, 848 (Tenn. 2010) (citing *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 479–80 (1990)). The purpose of the ripeness doctrine is to prevent courts "from entangling themselves in abstract disagreements." *State v. Price*, 579 S.W.3d 332, 338 (Tenn. 2019).

The ripeness doctrine involves a two-part inquiry: "(1) is the claim fit for judicial decision in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is the hardship to the parties of withholding court consideration?" *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (internal quotation marks and citations omitted).

**1.    Ripeness Prong One:  Is the claim fit for judicial decision?**
!
PDC's counterclaim for breach of contract states:

> Tire Discounters breached the Lease by refusing to be responsible for the increased costs that result from differences between the Building shown on the Final Plans as compared to the Outline Specifications.

[Doc. 24, ¶¶ 24-26]. The parties agree that the "increased costs" referred to here are the $57,994.00 in cost overruns related to the "Building," [Doc. 40, ¶¶ 10, 12, 13] and the $116,319.00 in cost

overruns related to the "Site Work." [Doc. 40, ¶¶ 10, 14]. They also agree that the $57,994.00 in Building cost overruns was "zeroed out" via Zola's September 10, 2019 email to Cappiello [Doc. 40, ¶ 13; Doc. 33-4, pg. 15].[10] In this same email, Zola told Cappiello that Tire Discounters would place money "back into [the] budget that wasn't previously included" [Doc. 33-4, pg. 15 (Email dated September 10, 2019 at 12:12 PM] to reduce the Site Work overrun from $116,319.00 to $57,241.00 [Doc. 40, ¶ 15]. Zola also suggested PDC and Tire Discounters split the difference, with each paying $28,620.50 [Doc. 40, ¶ 15].

PDC claims Zola's suggestion to split the remaining overage amount and his statement that Tire Discounters had "no obligation to [open the lease budget back up and increase the monthly rent]" was anticipatory breach of the Lease agreement [Doc. 39, pg. 9]. But the emails tell a different story. Cappiello did not object or offer an alternative to Zola's suggestion to split the overruns, but instead responded with "Yes, let's have a discussion." [Doc. 33-4, pg. 14]. Zola then wrote two more emails attempting to engage in further discussion [Doc. 33-4, pg. 14] to which Cappiello did not reply. The discussion about overruns ended because Cappiello stopped responding to Zola, not because Zola refused to work out a different solution. PDC has not shown that Tire Discounters unequivocally refused to perform as required for a claim of anticipatory repudiation. *See Hira v. New York Life Ins. Co.,* No. 3:13-CV-527, 2015 WL 2062116, at *5 (E.D. Tenn. May 4, 2015) ("In order to serve as an anticipatory breach or repudiation, the words and

---

[10]   PDC relies on the testimony of its expert [Doc. 40, ¶ 10], who testified that the "$57,994.00 in cost overruns related to the Building was zeroed out via [the] suggestion made by Tire Discounters on September 10, 2019." [Doc. 40, ¶ 13; Doc. 33-4, pg. 15]. PDC's expert testified that the $116,319.00 overrun related to "Site Work" was "reduced to $57,241" as reflected in an email from Tire Discounters, and that Tire Discounters proposed to PDC that the parties split that amount "50/50" so that each would be responsible for $28,620.50 of that site work overrun amount [Doc. 40, ¶¶ 15 (Response by PDC), 16].

conduct of the contracting party must amount to a total and unqualified refusal to perform the contract.") (internal quotation marks and citations omitted). That simply does not exist here.

The terms of the Lease also support a finding that PDC's breach of contract claim is premature. In section 3.2, the Lease outlines the respective responsibilities of each party if the estimated construction cost turns out to be higher than the "actual construction cost":

> Should the actual construction cost exceed the Estimated Cost, and such additional costs are the result of differences in the Building as shown in the Final Plans . . .[Tire Discounters] shall be responsible for the difference between such actual cost and the Estimated Cost, payable by [Tire Discounters] to [PDC] pursuant to the same calculation used for Change Orders in Section 4.3. Should the actual construction cost be greater than Estimated Cost and such additional costs are the result of Change Orders, then [Tire Discounters] shall be responsible for the difference between such actual cost and the Estimated Cost, payable by [Tire Discounters] to [PDC] pursuant to the terms of Section 4.3 of this Lease. Should the actual construction cost be greater than Estimated Cost for any reason other than that specified in the foregoing two sentences, [PDC] shall be solely responsible for the difference, and the Rent shall not increase.

[Doc. 1-1, pgs. 2- 3, Section 3.2].

Here the Lease clarifies which party will be responsible for any cost overruns between the estimated cost of construction and the "actual construction cost." The two scenarios where Tire Discounters is responsible for cost overruns refer to Section 4.3 of the Lease regarding payment: "[cost overrun shall be] payable . . . pursuant to the same calculation used for Change Orders in Section 4.3" and "[cost overrun shall be] payable . . . pursuant to the terms of Section 4.3 of this Lease." [Doc. 1-1, pg. 3]. Section 4.3 provides the following regarding payment:

> During construction . . . [Tire Discounters] shall [review and sign agreed upon change orders] to indicate . . . its agreement to pay for the changes *in the form of additional Rent*[.] Upon completion of the construction of the Building, [PDC] shall prepare a summary setting forth the net adjustment in the cost of the Building caused by Change Orders. [PDC's] cost shall be based upon the actual cost incurred in designing and performing the [Change Order work]. The annual Rent set forth in Section 3.1 shall be increased by a factor of 6.85% of the Change Order amount calculated pursuant to this paragraph.

10

[Doc. 1-1, pg. 4] (emphasis added). Read together, the plain language of Sections 3.2 and 4.3 provides that cost overruns owed by Tire Discounters are payable through recalculation of the rent it will pay to PDC. The question is when does that rent become due?

The Lease provides that Tire Discounters will be responsible for rent only after the building is "substantially completed," or Tire Discounters has begun operating its business there, whichever comes first [Doc. 1-1]. According to Section 3.1 of the Lease, rent payments shall begin "on the Rent Commencement Date." The "Rent Commencement Date" is "the earlier of (i) sixty (60) days after the Commencement Date or (ii) the date Lessee opens for business in the Leased Premises." [Doc. 1-1, pg. 2, Section 3.1]. The "Commencement Date" is the first day of the month following the date upon which the Building is "Available for Occupancy," which means when the Building "has been substantially completed [and when PDC] has received a "certificate of occupancy for the shell of the building." [Doc. 1-1, pg. 3, Sections 4.1 (i) and (iii)]. By the terms of the Lease, Tire Discounters would not owe rent until after the construction project was substantially completed or it had begun business operations in the Building. It follows that Tire Discounters would not become responsible for construction cost overruns, payable through rent adjustments, until after the building was substantially completed or it had begun business operations.

The construction project here is not substantially complete, and in fact has never begun. There is no dispute that PDC did not execute a contract with RTC or any other contractor to begin work on the construction. Regardless of the amount Tire Discounters may ultimately owe, it is not obligated to pay anything until the construction is substantially completed. PDC's breach of contract claim is not yet "fit for judicial decision."

PDC contends that the ripeness argument "does not consider [PDC's] position with respect to its alleged anticipatory breach." [Doc. 39, pg. 5]. Besides the email from Zola discussed above,

PDC points to an October 16, 2019 email between the parties' attorneys as further evidence of anticipatory breach. In the email, counsel for Tire Discounters wrote:

> I understand [Tire Discounters] and [PDC] entered into discussions regarding the budget overage for the project, and our client made an offer to increase the amount of rent payable under the Lease in order to help close the gap. Our client had no obligation to do so and now affirmatively withdraws that offer given the extended delay and lack of communication from [PDC].

[Doc. 1-2]. PDC argues that anticipatory repudiation is a question of fact for the jury to decide, and that it is not a proper inquiry on summary judgment [Doc. 32, pg. 13; Doc 39, pg. 9].

It is true that "whether the words and/or actions of the contracting party have risen to the level of repudiation is normally a question of fact to be determined by the trial court." *Mid-S. Indus., Inc. v. Martin Mach. & Tool, Inc.,* 342 S.W.3d 19, 26 (Tenn. Ct. App. 2010). However, as a matter of law, "[a]n indication that more negotiations are sought is not a total and unqualified refusal to perform." *UT Med. Grp., Inc. v. Vogt,* 235 S.W.3d 110, 120 (Tenn. 2007) (defendant's attempt to negotiate with her employer regarding the terms of her non-compete covenant before performance under the covenant was to begin was not anticipatory repudiation and summary judgment in her favor was proper).

The Lease contemplates ongoing negotiations before and during construction to resolve anticipated cost differentials and change orders [*See, e.g.* Doc. 1-1, Section 3.2, 4.2, and Section 4.3 paragraph 2]. The emails between Zola and Cappiello were attempts at negotiation the types of which were anticipated by the parties when they signed the Lease. Zola's suggestion that the parties split the cost overrun was part of a string of emails between Zola, Cappiello, and RTC hammering out the details and attempting to adjust prices in RTC's bid [Doc. 33-4, pgs. 7-17]. At the point when PDC claims Zola repudiated the contract, the parties were still discussing RTC's estimate which had not yet been finalized or signed. In the context of this discussion, Zola's email was a negotiation, not a repudiation.

The second alleged repudiation, the email from Tire Discounters' attorney rescinding Zola's offer, came a month after the price negotiations ceased due to PDC's lack of response to Zola's offer [Doc. 1-2, pgs. 1-2]. In the same email, the attorney lists six documents Tire Discounters wanted PDC to sign so that construction could begin under the terms of the Lease [*Id*.] This communication was again an attempt to negotiate and perform under the Lease rather than a repudiation of it. For these reasons, PDC's anticipatory repudiation argument fails as a matter of law.

**2.     Ripeness Prong Two: Hardship to the Parties**

The second prong of the "ripeness" inquiry requires the Court to consider whether delay of judicial consideration will create hardship for the parties. PDC states that "any delay of judicial review" will impose a "significant and irrevocable hardship on [PDC]." [Doc. 39, pg. 3]. Beyond this statement, PDC offers no facts to reflect hardship it will endure if the Court finds its breach of contract claim is not ripe [*See generally* Doc. 39; Doc. 40, pg. 6, ¶¶ 1-6 (PDC's Statement of Additional Facts)]. In its countercomplaint, PDC claims that it has "incurred and continues to incur monetary damages, including but not limited to, lost rental income that could have been generated under the Lease, cost incurred to relocate the business that was operating on the Leased Premises, attorneys fees and expenses, and other costs resulted from PDC's inability to make use of the Leased Property." [Doc. 24, ¶ 27]. These damages can all be addressed if PDC's claim ripens into an actual controversy and the Court finds that Tire Discounters breached the Lease agreement. But that time has not yet come. Therefore, the second "ripeness" factor weighs in favor of dismissal.

For the above reasons, Tire Discounters' motion for summary judgment is **GRANTED**. PDC's Count II claim for breach of contract [Doc. 24, pg. 12, ¶¶ 23-27] is not ripe for judicial decision and is therefore **DISMISSED WITHOUT PREJUDICE**. Further, PDC's claim of

anticipatory repudiation is not cognizable because the complained of repudiations were attempts at negotiation contemplated in the Lease itself. Because this matter is not ripe and no anticipatory repudiation is found, the Court does not reach the second threshold issue raised by Tire Discounters, namely which party is obligated to pay the cost overruns pursuant to Section 3.2 of the Lease. Accordingly, the Court also declines to rule on PDC's affirmative defenses 4, 8, and 9 [Doc. 24, pgs. 7-8, ¶¶ 4, 8 and 9].

**B.    PDC's Motion for Partial Summary Judgment [Doc. 36]**

PDC seeks partial summary judgment dismissing Tire Discounters' claims for specific performance (Count II) and breach of the implied duty of good faith and fair dealing (Count IV) [Docs. 36, 37]. PDC also seeks dismissal of Tire Discounters' requested relief for compensatory damages, punitive damages, consequential damages, and attorneys' fees [Doc. 36, pg. 1].

**1.    Count IV:  Breach of Implied Duty of Good Faith and Fair Dealing**

Tire Discounters alleges breach of contract in Count III of its complaint [Doc. 1, ¶¶ 41-44], and breach of the implied duty of good faith and fair dealing separately in Count IV [Doc. 1, ¶¶ 45-49]. PDC argues that the implied duty claim should be dismissed because "Tennessee law does not recognize an independent cause of action for breach of implied duty of good faith and fair dealing under these facts." [Doc. 36, pg. 1]. Tire Discounters agrees that the implied duty of good faith and fair dealing "is not a stand-alone claim" but argues that Count IV should be "treated as part of [its] breach of contract claim" and should not be dismissed [Doc. 44, pg. 4]. "Tennessee law recognizes an implied covenant of good faith and fair dealing in every contract." *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. 2013) (internal citation omitted). However, a "breach of the implied covenant of good faith and fair dealing is not an independent basis for relief." *Fountain Leasing, LLC v. Kloeber*, No. 3:12-CV-317, 2013 WL

14

4591622, at *4 (E.D. Tenn. Aug. 28, 2013) (internal quotation marks and citations omitted). The implied duty of good faith and fair dealing serves as part of a breach of contract action rather than [as] a cause of action in and of itself. *Id*. (quoting *Lyons v. Farms Ins. Exch.*, 26 S.W.3d 888, 894 (Tenn. Ct. App. 2000).

Tire Discounters relies on *Riley v. KeyCorp,* No. 1:11 CV 1150, 2012 WL 523704, at *1 (N.D. Ohio Feb. 16, 2012) to argue that its claim for breach of the implied duty of good faith and fair dealing should not be dismissed merely because it is captioned separately from its breach of contract claim [Doc. 44, pg. 6].[11] In *Riley*, the plaintiffs' breach of contract claims that were "separated out into express and implied claims." *Id*. at *11. Like in this case, the *Riley* defendant sought dismissal arguing that "breaches of implied duties of good faith are not separate causes of action." *Id*. at *11. The plaintiffs then requested leave to amend their complaint and consolidate the separate claims into a single breach of contract claim. *Id*. Though the court considered it a "close call" as to whether to dismiss the implied duty claim, it chose instead to order the plaintiffs to file an amended complaint consolidating the separate breach claims. *Id*.

Here, Tire Discounters has not moved to amend its complaint to consolidate the breach of contract claims as the plaintiffs did in *Riley*, and an order to amend at this point would cause unnecessary delay. But the Court does not find amendment necessary because the separate counts in Tire Discounters' complaint are not confusing or duplicitous. The claims can easily be read together and consolidated, despite their separate headings. Paragraph 46 of the complaint provides the necessary connection between the two, stating that, "the Lease, like every contract, contains an implied covenant of good faith and fair dealing which required the Parties to act with good faith and in a commercially reasonable manner." [Doc. 1, ¶ 46]. If Tire Discounters had only alleged

---

[11] Ohio law is the same as Tennessee law in that it does not recognize an independent cause of action for breach of the duty of good faith and fair dealing. *Riley*, 2012 WL 523704, at * 10.

the implied duty claim without alleging breach of contract, dismissal may have been warranted. *See Roby v. NationStar Mortgage, LLC,* No. W201900730COAR3CV, 2020 WL 2315784, at *7 (Tenn. Ct. App. May 11, 2020) (Sept. 18, 2020) ("[I]n the absence of [a] breach of contract claim, the trial court rightfully dismissed Plaintiff's claim for breach of the implied covenant of good faith and fair dealing."). But Tire Discounters *has* alleged breach of contract. PDC attacks the claim for breach of the implied duty of good faith and fair dealing solely on its form and captioning. This is not enough to warrant dismissal. For these reasons, PDC's motion for summary judgment is **DENIED** as to Tire Discounters' Count IV claim of breach of the implied duty of good faith and fair dealing.

**2.    Count II: Specific Performance**

In Count II of its complaint, Tire Discounters asks the Court to "order [PDC] to perform its obligations under the Lease, including, but not limited to, completing the permitting paperwork . . . and to begin construction of the Building, according to the Final Plans, within five (5) days of the receipt of the proper permits." [Doc. 1, ¶ 40]. PDC argues that Tire Discounters is not entitled to specific performance, nor to its claims for damages and attorneys' fees, because "the Lease explicitly provides a sole and exclusive remedy for the alleged breach by [PDC]" and "the Lease is silent on [recovery] of attorneys' fees . . . ." [Doc. 37, pg. 8]. Section 4.4 of the Lease provides, in relevant part:

> In the event that the Building is not Available for Occupancy due to [PDC's] default [on or before] the later of: one hundred and eighty (180) days following the Construction Commencement Date or November 1, 2019 (the "Delivery Date"), [Tire Discounters'] sole remedy shall be either to (i) extend the time for completion (with [PDC] being liable to [Tire Discounters] for liquidated damages in the amount of $500.00 per day) or (ii) in the event that the Building is not Available for Occupancy on or before ninety (90) days following the Delivery Date, terminate this Lease, in which event the parties shall be released from all further liability under this Lease.

16

[Doc. 1-1, pgs. 4-5, Section 4.4]. According to PDC, this provision "reflects the clear agreement of the parties . . . to limit the extent of damages for a breach." [Doc. 37, pg. 9].

Tire Discounters argues specific performance is appropriate because the "liquidated damages . . .for [PDC's delay in] delivering the building improvements necessarily contemplates that PDC is performing the Lease by constructing the improvements." [Doc. 44, pg. 9]. According to Tire Discounters, Section 4.4 provides "security for[,] not an alternative to PDC's performance of the Lease." [Doc. 44, pg. 2]. It argues that nothing in Section 4.4 "gives PDC the option to just walk away from the Lease for $500.00 per day." [Doc. 44, pg. 9].

"Specific performance is an equitable remedy. Whether specific performance should be awarded is a determination that lies within the discretion of the trial court and depends on the facts of each individual case." *Hometown Folks, LLC v. S & B Wilson, Inc.*, No. 1:06-CV-81, 2008 WL 918519, at *1 (E.D. Tenn. Apr. 3, 2008), *aff'd,* 643 F.3d 520 (6th Cir. 2011) (citing *Shruptrine v. Quinn,* 597 S.W.2d 728, 730 (Tenn.1979)). Generally, "[s]pecific performance is inappropriate where continuous or long-term judicial supervision would be required, the terms of the contract are not sufficiently certain, or the party requesting specific performance may, through the exercise of discretion, terminate the contract." *Lowe's Home Centers, Inc. v. LL & 127, LLC,* 147 F. App'x 516, 524 (6th Cir. 2005) (internal citations omitted). Here, ordering specific performance of the Lease would likely require the Court to supervise negotiations and implementation of the construction project until Tire Discounters occupied the Building, the length of which is unknown. Further, Tire Discounters has available to it the alternative remedy of terminating the Lease pursuant to Section 4.4. These considerations cut against an award of specific performance.

On the other hand, PDC asks the Court to rule out specific performance as a remedy before all the evidence can be weighed at trial. It is true that "[g]enerally, a court will not award specific

performance unless an award of damages would be an inadequate remedy." *Hometown Folks, LLC,* 2008 WL 918519 at *1 (citing *Shruptrine,* 597 S.W.2d at 730). But it is impossible to know at this point whether damages alone would suffice to make Tire Discounters whole. Moreover, this dispute involves a long-term Lease for use of real property upon which Tire Discounters planned to operate its business for a minimum of 15 years [Doc. 1-1, pg. 1]. "Specific performance is [appropriate] when dealing with contracts for the conveyance of real property because real property is unique, [and often] damages is simply not an adequate remedy." *GRW Enterprises, Inc. v. Davis*, 797 S.W.2d 606, 614 (Tenn. Ct. App. 1990). This dispute involves a lease agreement rather than a conveyance, but courts have not categorically ruled out ordering specific performance of lease agreement provisions. *See McCullough v. Silverfield*, 215 S.W.3d 356 (Tenn. Ct. App. 2006) (specific performance of a Lease agreement was warranted when lessee sought court intervention to enforce a right of refusal clause after lessor sold the property to a third party).

Though specific performance may not be warranted, it would be premature for the Court to tie its own hands at the summary judgment stage by precluding it as a potential remedy. PDC's motion for summary judgment as to Count II of Tire Discounters' complaint is therefore **DENIED**.

3. **Damages and Attorneys' Fees**

PDC moves the Court to dismiss Tire Discounters' claims for compensatory and punitive damages, consequential damages, and attorney's fees and expenses "because the Lease explicitly provides a sole and exclusive remedy for the alleged breach by Defendant." [Doc. 37, pg. 8]. PDC points to the same provision in Section 4.4 which provides that Tire Discounters' "sole remedy" shall be liquidated damages of $500 per day or termination of the Lease if the Building is not available for occupancy due to PDC's default [Doc. 1-1, pg. 4, Section 4.4].

To determine the intent of contracting parties, courts examine the "plain and ordinary meaning of the written words that are contained within the four corners of the contract." *Dick*

*Broadcasting Co., Inc. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013) (internal quotation marks and citation omitted). The plain language of Section 4.4 gives Tire Discounters a choice in case the Building is not timely available for occupancy: (1) extend the time for PDC to complete the Building (with daily liquidated damages payable for the duration of the delay) or (2) terminate the Lease. The daily liquidated damages provide Tire Discounters a remedy in case PDC causes delay in construction. They do not provide a remedy if PDC breaches the Lease by refusing to perform. To interpret Section 4.4 as a remedy for PDC's total breach would lead to an absurd result: PDC owing Tire Discounters liquidated damages of $500 per day forever, or Tire Discounters terminating the Lease with no possibility of recovering damages at all. Because Section 4.4 provides a remedy only in the limited circumstance of construction delay, it cannot reasonably be interpreted as providing the sole remedy in case of total breach. Hence, PDC's motion for summary judgment as to Tire Discounters' claims for damages and attorneys' fees is DENIED.

## IV. CONCLUSION

For the above reasons, Tire Discounters' motion for partial summary judgment [Doc. 31] is **GRANTED** and PDC's breach of contract claim [Doc. 24, ¶¶ 23-27] is **DISMISSED WITHOUT PREJUDICE**. PDC's motion for partial summary judgment [Doc. 36] is **DENIED**.

SO ORDERED:

s/Clifton L. Corker  
United States District Judge
